# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | **Case No. 16-00374-TLM** |
| **RONALD A. IVIE, JR.,** | ) | |
| | ) | **Chapter 7** |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| **FTE NETWORKS, INC. and** | ) | |
| **JUS-COM, INC.,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Adv. No. 16-06020-TLM** |
| | ) | |
| **RONALD A. IVIE, JR.,** | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION

Plaintiffs FTE Networks, Inc. and its wholly owned subsidiary Jus-Com, Inc. (referred to collectively as "FTE") brought this adversary proceeding seeking to except a debt from the discharge of defendant, chapter 7 debtor Ronald Ivie, Jr. ("Ivie"), under § 523(a)(6).[1]  The matter was tried on October 18 and 19, 2017.[2]

---

[1]  Unless otherwise indicated all statutory references are to the Bankruptcy Code, Title 11 U.S. Code §§ 101–1532.  "Adv. Doc. No." refers to filings in the instant adversary proceeding, while "Doc. No." refers to documents filed in Ivie's bankruptcy case, Case No. 16-00374-TLM.

[2]  The trial transcript from October 18, 2017, is found in Adv. Doc. No. 37 ("TR 1") and the trial transcript from October 19, 2017, is found in Adv. Doc. No. 38 ("TR 2").

MEMORANDUM OF DECISION - 1

After the parties submitted written closing arguments, the matter was taken under advisement on February 12, 2018.  This decision constitutes the Court's findings of fact and conclusions of law.[3]

**FACTS**

### A.    The Contractual Relationships

FTE is a contractor in the business of constructing telecommunications networks.  Ericsson Inc. ("Ericsson") is a project manager that oversees construction projects for telecommunication service providers, such as CenturyLink.  FTE and Ericsson entered into a "Master Service Agreement" in July 2014, which provided the terms of the relationship between Ericsson and FTE as its subcontractor on any future "task orders."  Ex. 2017 ("MSA").  The MSA provides that any task orders accepted by FTE are subject to and become "a part of" the MSA.  *Id.* at 2–3.  The MSA included a three-year term, which automatically renewed for additional one-year terms until either party provided appropriate notice and terminated the MSA.  *Id.* at 3.

Under the MSA, FTE performed construction of an expansion of CenturyLink's fiber optic network in Seattle, referred to by the parties as the "pilot project."  In July 2014, Ivie, as president and manager of ID Consulting Solutions, LLC ("IDCS"), signed a contract with FTE to perform engineering and design work on the pilot project.  Ex. 2039 at 12.  IDCS was a business at least partially

---

[3]  Fed. R. Bankr. P. 7052.

MEMORANDUM OF DECISION - 2

owned by Ivie.[4]

Ericsson later issued an additional task order awarding FTE the task of further expanding the fiber optic network for CenturyLink in Seattle and also a task order to expand CenturyLink's network in Las Vegas.[5]

In October 2014, FTE contracted with IM Services, LLC ("IMS") to provide engineering and design services related to the expansion of CenturyLink's fiber optic networks in Seattle and Las Vegas. Ex. 1000. IMS was a company created by Ivie and Alex McLarty ("McLarty"). According to McLarty, it was formed for the purpose of locating projects and obtaining funding for the projects. TR 2 at 7. After entering into its agreement with FTE, IMS then subcontracted with IDCS to perform the required engineering and design services. Once the services were rendered, IDCS invoiced IMS, who in turn invoiced FTE for payment.[6]

On January 5, 2015, Ivie, as the president of IDCS, contacted FTE requesting payment of outstanding invoices. Ivie explained that more than $360,000 was owed and that IDCS was unable to continue performing work under

---

[4] Evidence in the record suggests Ivie owned either ninety-five or one-hundred percent of IDCS. *See* Exs. 1025, 1028. However, according to testimony at trial, another individual, Randy Dinger, also claimed an ownership interest in IDCS. *See* TR 1 at 202–205. Whether wholly owned by Ivie or not, he was president and in complete control of IDCS.

[5] *See* Exs. 2018, 2019, 2020.

[6] Exs. 2029, 2030.

MEMORANDUM OF DECISION - 3

the contract for FTE without payment.  Ex. 1030.  FTE responded that a "closing" was scheduled for the following week, suggesting that payment would be available then.  *Id*.[7]

On January 16, 2015, Ivie again contacted FTE by email and explained that "I cannot continue spending $150K a month with $20K revenue," and "I have to have at least $15K a week to get caught up, if not, I will not make it."  Ex. 1031. FTE responded by explaining that "[w]e are moving as fast as we can to get the docs in order" to complete "closing."  *Id*.

On January 26, 2015, Ivie again contacted FTE, explaining "I'm running low on funds and cannot make payroll. . . .  At this point, if we do not get paid up in a week, I will be forced . . . to submit a lien on the Seattle and LV project.  I have no choice. . . .  This is coming to a point now, I have tried to hang on as long as possible, I have nowhere to go."  Doc. No. 1032.  FTE responded that it was finalizing a "refi" and that it would pay the outstanding invoices when it was complete.   Further, FTE warned that filing liens would "be extremely bad for both of us" and would "get you no closer to being paid but will push it out much further."  *Id*.

FTE failed to pay the outstanding invoices and the parties entered into

---

[7]  The email communications between Ivie and FTE frequently refer to "closing" as a condition affecting payment, but the meaning of that term was not clarified by the parties.

MEMORANDUM OF DECISION - 4

negotiations regarding potential resolutions.[8]  One such solution involved FTE

purchasing IDCS.  FTE and Ivie, on behalf of IDCS, entered into an "Interest

Purchase Agreement" ("IPA"), under which FTE would purchase a one-hundred

percent interest in IDCS.  Ex. 1027.  However, another individual, Randy Dinger,

claimed an interest in IDCS and would not agree to the transaction, and the IPA

was eventually rescinded by FTE.  Ex. 1035.  Despite this attempt by IDCS and

FTE to resolve their issues, and the commencement of an arbitration proceeding,

no final resolution was reached.

### B.     IDCS's Chapter 11 Case

On July 10, 2015, Ivie caused IDCS to file a petition under chapter 11.

Case No. 15-00918-TLM (the "IDCS Chapter 11").  IDCS, under Ivie's control,

wanted to collect the FTE receivable.  The schedules in the IDCS Chapter 11 case

asserted FTE owed $729,285.01.  Ex. 1045.  The approach taken to collect this

receivable is at the heart of this action.

Though IDCS was represented by counsel, Ivie consulted only with IDCS's

bookkeeper and controller, Sabitha Kelsey ("Kelsey"), and McLarty.  Kelsey, who

had some prior experience filing liens for a residential construction company in

Nevada, suggested that mechanics liens might be a means by which IDCS could

---

[8]  IMS's contracts with FTE required disputes to be resolved by arbitration absent mutual
agreement otherwise.  Exs. 2007, 2028.

MEMORANDUM OF DECISION - 5

secure and collect the amounts due.  Kelsey testified she was on the "forefront" of

the effort to determine whether mechanics liens could be used to secure what

IDCS was owed.  McLarty, who had no prior experience with filing mechanics

liens, assisted Kelsey in researching whether using mechanics liens was a viable

option.  To that end, McLarty contacted an attorney in the Seattle area and, as a

result, he and Kelsey thought it was appropriate to file mechanics liens against real

properties in the area that would be serviced by the fiber optic networks for which

IDCS provided engineering and design work.  Ivie decided the liens should be

threatened, then filed, and directed Kelsey to prepare the necessary documents to

send to the property owners.  Over the course of several days, Kelsey identified

hundreds of property owners in Seattle and Las Vegas and prepared notices to be

sent to each property owner.

On July 21, 2015, IDCS, under Ivie's direction, issued fifteen-day notices

of intent to lien, with attached letters signed by Ivie as president of IDCS (the"Lien

Letters").  The Lien Letters were sent to hundreds of home and other real property

owners in Seattle and Las Vegas.  *See, e.g.,* Exs. 2002, 2006.  The Lien Letters

generally outlined the relationships between CenturyLink, Ericsson, FTE, and

IDCS, and explained that IDCS had provided engineering and design services

necessary for expansion of CenturyLink's fiber optic network.  The Lien Letters

further explained that FTE had failed to pay IDCS for its services and, despite

MEMORANDUM OF DECISION - 6

contacting Ericsson and CenturyLink, IDCS remained unpaid.  The Lien Letters

asserted that FTE's nonpayment created a "financial crisis" and that IDCS was

forced to file liens in order to secure payment.  Finally, the Lien Letters stated

"[w]e regret having to process liens and for filing for protection; however, the

company had no other option and will continue to leverage CenturyLink, the City

Permit offices, County Engineering offices, Public Works, and the media for

financial relief."  *Id.*  The Lien Letters included telephone numbers for individuals

with FTE, Ericsson, and CenturyLink, and the property owners were told that liens

would be filed on their property fifteen days from the date of notice if payment

was not made to IDCS.  Ex. 2002.

One week later, FTE initiated an adversary proceeding and filed therein a

motion for an injunction preventing IDCS from filing liens in Seattle and Las

Vegas as threatened in the Lien Letters.  Adv. No. 15-6051-TLM.  On August 3,

2015, the Court granted FTE's motion for a temporary restraining order.

On October 2, 2015, this Court entered a decision finding the Lien Letters

were "asserted and sent without credible legal basis or support" and that they

included contact information for CenturyLink, Ericsson, and FTE "to encourage

predictably outraged property owners to contact these other parties, thus creating

MEMORANDUM OF DECISION - 7

pressure and leverage on those parties."[9]  The Court further found that issuance of

the Lien Letters "caused the creation of significant claims against the [Chapter 11]

estate by FTE and potentially others," and that IDCS's bankruptcy filing

"appear[ed] designed to cause injury and gain tactical leverage, and it certainly had

that practical effect."[10]  Holding that "egregious behavior and other indicia of bad

faith"—including issuance of the Lien Letters— implicated "manipulation and

inequitable use of the bankruptcy process," the IDCS Chapter 11 case was

dismissed.[11]

### C.    Ivie's Chapter 7 Case

 Ivie filed his personal chapter 7 petition on March 25, 2016.  FTE filed the

complaint initiating this adversary proceeding on June 17, 2016, alleging that,

under Idaho law, sending the Lien Letters constituted tortious interference with a

contract and intentional interference with FTE's economic advantage.  FTE seeks

damages in the amount of "not less than $750,000."  Adv. Doc. No. 1 at 8.  FTE

further alleges that Ivie acted willfully and maliciously when he caused the Lien

Letters to be sent and, thus, his liability to FTE should be excepted from discharge

pursuant to § 523(a)(6).

---

[9]  *See* IDCS Chapter 11, Doc. No. 128 (transcript of October 2, 2015 oral ruling).

[10]  *Id*. at 24, 28.

[11]  *Id*. at 29.

MEMORANDUM OF DECISION - 8

**DISCUSSION AND DISPOSITION**

There are two distinct issues that the Court evaluates in considering nondischargeability of a debt under § 523(a)(6). The first is the establishment of a debt itself, and the second is a determination of the nature—dischargeable or nondischargeable—of that debt. . . .

Section 523(a)(6) excepts from an individual debtor's discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." Both willfulness and maliciousness must be proven to prevail under § 523(a)(6). *Ormsby v. First Am. Title Co. of Nevada (In re Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010).

*Meer v. Lilly (In re Lilly)*, 2012 WL 6589699, *6–7 (Bankr. D. Idaho Dec. 18, 2012).[12] FTE must prove all requisite elements for nondischargeability by a preponderance of the evidence. *See Cadleway Properties, Inc. v. Armstrong (In re Armstrong)*, 2006 WL 2850527, *10 (Bankr. D. Idaho Oct. 3, 2006) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)) (additional citations omitted).

**A.      Establishing a Debt Owed by Ivie**

As this Court has previously explained:

At times the debt at issue has previously been liquidated; other times it has not. In the case of an unliquidated debt, the bankruptcy court must necessarily determine liability and damages in order to establish the underlying debt. Adjudication of the underlying claim, which arises under nonbankruptcy law, becomes part and parcel of the dischargeability determination and thus integral to restructuring the debtor-creditor relationship.

---

[12]   The Ninth Circuit has articulated the elements required to prove willful and malicious injury. *See Ormsby*, 591 F.3d at 1206, 1209 (quoting *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002), and *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1209 (9th Cir. 2001)).

MEMORANDUM OF DECISION - 9

*Stanbrough v. Valle (In re Valle)*, 469 B.R. 35, 43 (Bankr. D. Idaho 2012).  As

noted, FTE alleges that, under Idaho law,  IDCS tortiously interfered with FTE's

contractual relationship with Ericsson and intentionally interfered with FTE's

prospective economic advantage and is liable for damages resulting from either or

both types of interference.

FTE further contends that because Ivie knowingly participated in these

intentional torts, he is jointly and severally liable for the loss suffered.  Under

Idaho law:

> A director who personally participates in a tort is personally liable to
> the victim, even though the corporation might also be vicariously
> liable." *Eliopulos v. Knox*, 123 Idaho 400, 404, 848 P.2d 984, 988 (Ct.
> App. 1992).  The same is true for corporate officers.  *See*, *e.g.*, 18B
> Am. Jur. 2d Corporations § 1609 (2016) ("A director or officer of a
> corporation does not incur personal liability for its torts ... unless he or
> she has participated in the wrong, had direct personal involvement ...
> or authorized or directed that the wrong be done.").  "A contrary rule
> would enable a director or officer of a corporation to perpetrate flagrant
> injuries and escape liability behind the shield of his or her
> representative character even though the corporation might be insolvent
> or irresponsible." *Id.*

*Forbush v. Sagecrest Multi Family Property Owners' Assoc. Inc.*, 396 P.3d 1199,

1214 (Idaho 2017).  *See also*, *Smith v. Great Basin Grain Co.*, 561 P.2d 1299

(Idaho 1977).  "Participation" may be found on the basis of direct action, but also

may consist of knowing approval or ratification of the unlawful acts of others.  *Id.*

There is preponderating evidence that Ivie was responsible for directing

MEMORANDUM OF DECISION - 10

Kelsey and McLarty to research and prepare the Lien Letters. Ivie also signed

those documents, and he directed they be sent. *See* Exs. 2002, 2006. Therefore,

the Court concludes that to the extent IDCS is liable for damages caused by the

issuance of the Lien Letters, Ivie is personally liable for the same.[13]

### 1.    Tortious Interference with a Contract

The Idaho Supreme Court has explained the elements of tortious

interference:

> One who intentionally and improperly interferes with the
> performance of a contract (except a contract to marry) between another
> and a third person by inducing or otherwise causing the third person not
> to perform the contract, is subject to liability. . . ." Restatement
> (Second) of Torts § 766 (1979). . . . Tortious interference with contract
> has four elements: "(1) the existence of a contract; (2) knowledge of the
> contract on the part of the defendant; (3) intentional interference
> causing a breach of the contract; and (4) injury to the plaintiff resulting
> from the breach." *Bybee v. Isaac*, 145 Idaho 251, 259, 178 P.3d 616,
> 624 (2008). The plaintiff must establish these elements before the
> burden switches to the defendant to explain the interference with the
> contracts. *Nw. Bec–Corp v. Home Living Serv.*, 136 Idaho 835, 841, 41
> P.3d 263, 269 (2002).

*Wesco Autobody Supply, Inc. v. Ernest*, 243 P.3d 1069, 1083 (Idaho 2010).

The first two elements are met. It is undisputed that a contract existed

between FTE and Ericsson, and that IDCS was aware of a contract between FTE

and Ericsson, though perhaps not all the specific details of that contract.

---

[13]  FTE also argues Ivie is personally liable for IDCS's conduct under an alter ego theory.
This argument need not be discussed because the Court finds that Ivie not only participated in,
but is responsible for, IDCS's conduct.

MEMORANDUM OF DECISION - 11

To meet its burden of proof on the third element, FTE was required to show that IDCS's actions actually *caused a breach* of a contract. *See Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 824 P.2d 841, 859 (Idaho 1991). A showing of some distant, proximate causal connection is not sufficient. *Id.*

Ivie contends FTE has not shown a causal connection between the issuance of the IDCS Lien Letters and Ericsson's discontinuing its relationship with FTE. He argues that Ericsson's actions are more likely the result of FTE's failure to pay its subcontractor than IDCS's sending the Lien Letters. FTE, on the other hand, argues that the act of issuing the Lien Letters, constituted a breach of the MSA. The MSA provides:

> Contractor[14] agrees to perform the Work in a manner which keeps the Work and the property or premises of Ericsson, its Affiliates, Customers, or the Work site landowners free from Liens of any kind. . . . *Under no circumstances will Contractor* (*or any of its* agents, employees, or *subcontractors*) *create, attach, file or perfect any lien,* security interest or any other encumbrance in, *on or to any property of Ericsson* (including, without limitation, the Network Equipment) *or any property of any Customer*[15] and Contractor agrees that such right to file any such lien, claim or charge is hereby waived expressly. *Contractor will not serve or file any notice or document*, or take any other action, *which would be a prerequisite for filing a lien claim.*

Ex. 2017 at 16 (emphasis added).

This clause, upon which FTE's argument is based, provides two

---

[14] The MSA defines "Contractor" to be FTE. Ex. 2017 at 1.

[15] "Customer" is defined as "a customer of Ericsson to which Ericsson provides services and/or products."

MEMORANDUM OF DECISION - 12

prohibitions: (1) actual creation, filing or attachment of a lien by FTE *or its subcontractors*, and (2) acts *by FTE* that would be prerequisite to its filing of a lien. In this case, it is undisputed that IDCS, a subcontractor, did not actually file a lien against any of the properties. Rather, IDCS sent the Lien Letters notifying property owners of its *intent* to file liens—prerequisites to actually filing the liens. However, under the MSA, subcontractors are not prohibited from acts prerequisite to filing lien claims; that prohibition only pertains to the "Contractor" (FTE). Thus FTE has not shown that IDCS's issuance of the Lien Letters were acts that themselves breached the MSA.

John Klumpp ("Klumpp"), FTE's Chief Strategy Officer, testified FTE had a strong relationship with Ericsson until the Lien Letters were issued. According to Klumpp, shortly after the Lien Letters were sent, the relationship "wound up." He further testified that the Lien Letters created a "crisis" that forced FTE, Ericsson, and CenturyLink to do "damage control." Klumpp explained that Ericsson did not "officially terminate" the MSA, but simply "didn't give us any more work. It was over." TR 1 at 189-209. Under the MSA, according to Klumpp, if at any time FTE was not "living up to the quality and the delivery standards time and whatever, then the work can go away. There's no guarantee in there." *Id*.

Thus while the Lien Letters clearly had an impact on the relationship

MEMORANDUM OF DECISION - 13

between FTE and Ericsson, there is no preponderating evidence that the MSA was

breached as a result.  There was no evidence provided suggesting that Ericsson

declared a breach. nor was there proof that Ericsson refused to give FTE additional

work "because of a breach."  Rather, Ericsson simply declined to issue additional

task orders to FTE.  According to Klumpp, this was within Ericsson's rights under

the MSA if Ericsson was not content.  Because FTE failed to meet its burden of

proving that IDCS's issuance of the Lien Letters caused a breach of the MSA, it

has failed to establish tortious interference with a contract under Idaho law.

### 2.    Intentional Interference with a Prospective Economic Advantage

FTE also alleges that, by sending the Lien Letters, IDCS intentionally and

tortiously interfered with FTE's prospective economic advantage.  To establish a

claim for intentional interference with a prospective economic advantage, FTE

must show:

> (1) the existence of a valid economic expectancy, (2) knowledge of the
> expectancy on the part of the interferer, (3) intentional interference
> inducing termination of the expectancy, (4) the interference was
> wrongful by some measure beyond the fact of the interference itself,
> and (5) resulting damage to the plaintiff whose expectancy has been
> disrupted.

*Wesco,* 243 P.3d at 1081 (quoting *Cantwell v. City of Boise*, 191 P.3d 205, 216

(Idaho 2008)).  With regard to the *mens rea* elements, a corporation is liable for

this tort if the directors or officers of the corporation committed the acts

MEMORANDUM OF DECISION - 14

constituting the tort while they had the requisite mental intent or knowledge. *Steed v. Grand Teton Council of the Boy Scouts of America, Inc.*, 172 P.3d 1123, 1130 (Idaho 2007).

There is no dispute that FTE had a valid economic expectancy in continuing its relationship with Ericsson, nor that FTE was injured when the relationship with Ericsson was diminished. The Court finds elements (1) and (5) are met.

### a.    Knowledge

The knowledge element may be "satisfied by actual knowledge of the prospective [economic advantage] or by knowledge of facts which would lead a reasonable person to believe that such interest exists. " *Highland Enters., Inc. v. Barker,* 986 P.2d 996, 1004-05 (Idaho 1999) (internal quotes and citations omitted).

Here, the preponderating evidence establishes IDCS's and Ivie's knowledge of FTE's expectancy. At the time IDCS commenced work for FTE on the pilot project in Seattle, Ivie was at least made generally aware of the relationship between Ericsson and FTE. Later, Ivie signed agreements on behalf of IMS to perform engineering and design work on larger Ericsson projects in both Seattle and Las Vegas and, again, Ivie was aware of the ongoing business relationship between Ericsson and FTE. Based on the history of FTE's relationship constructing fiber optic networks for Ericsson and Ivie's involvement in several

MEMORANDUM OF DECISION - 15

such projects, and on the whole of the evidence, the Court finds Ivie had actual

knowledge of FTE's expectancy of work from Ericsson.  At a minimum, a

reasonable person in Ivie's position would believe FTE had an economic

expectancy in continuing the relationship and obtaining additional projects from

Ericsson.  Therefore, element (2) is met.

### b.      Intent and Wrongfulness

Intent to interfere may be demonstrated if it is shown that the actor desires

to bring about the interference, or knows that the interference is certain or

substantially certain to occur as a result of his action.  *Wesco*, 243 P.3d at 1082

(internal quotes and citations omitted).  Intent can be shown even if the

interference is incidental to the actor's intended purpose and desire but known to

him to be a necessary consequence of his actions.  *Id*.

IDCS sent the Lien Letters with the intent of triggering a frenzy of contact

to FTE, Ericsson, and/or CenturyLink from concerned property owners.  IDCS

wanted to bring this pressure to bear in an attempt to force payment, and a

necessary consequence of such pressure was strain on the relationships among the

three parties.  This would necessarily include strain on and interference with FTE's

relationship with Ericsson and, thus, the associated economic expectancy of FTE

in continuing that relationship.  This interference was substantially certain to occur

as a result of the Lien Letters.  Thus, FTE met its burden of proving IDCS intended

to interfere with FTE's economic expectancy when it sent the Lien Letters, and

MEMORANDUM OF DECISION - 16

element (3) is met.

To establish the intentional interference was wrongful, FTE may offer proof that either: "(1) the defendant had an improper objective or purpose to harm the plaintiff; or (2) the defendant used a wrongful means to cause injury to the prospective business relationship." *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 824 P.2d 841, 861 (Idaho 1991).

Clearly one of IDCS's purposes in sending the Lien Letters was to encourage payment. However, as this Court previously found, the inclusion of the names and contact information for Ericsson, CenturyLink and FTE in the Lien Letters was to encourage outraged property owners to contact some or all of these parties, thus creating pressure and leverage. IDCS and Ivie made no legal inquiry into whether using liens or the threat of liens in these circumstances was proper. Though IDCS had legal counsel, it and Ivie instead relied on a bookkeeper's history with liens in a residential construction context and McLarty's inquiries. No credible legal basis for the threatened liens was ever established.

The Lien Letters were a wrongful means of attempting to elicit payment from FTE. The use of liens, especially in this manner, as opposed to legitimate business processes to collect its receivable, was intended and designed to inflict injury on FTE. It was, at the very least, a "wrongful means." Thus element (4) is established, and all five elements are met. IDCS and Ivie intentionally interfered with FTE's prospective economic advantage in continuing its relationship with

MEMORANDUM OF DECISION - 17

Ericsson.

### 3.    Damages

The Court turns to the most problematic aspect of this case—adequate proof of damages.  In its complaint, FTE asserts it was damaged in an amount "not less than $750,000."  Adv. Doc. No. 1 at 8.  FTE's post-trial briefing asks for "an order from this Court determining the amount of lost profits FTE suffered as a result of Ivie's conduct and except[ing] that amount from discharge[.]"  Adv. Doc. No. 41 at 4.  Yet FTE's briefing does not suggest what that figure should be, or what FTE believes the evidence established as far as a damage amount.[16]

"A person asserting a claim of damages has the burden of proving not only a right to damages, but also the amount of damages" with reasonable certainty. *Bratton v. Scott*, 248 P.3d 1265, 1272 (Idaho 2011); *O'Dell v. Basabe*, 810 P.2d 1082, 1099 (Idaho 1991).  The Idaho Supreme Court held, in *Horner v. Sani-Top, Inc.*, 141 P.3d 1099, 1106 (Idaho 2006), that "when considering an award of damages for future losses, the question is whether the plaintiff has proven damages with reasonable certainty." *Id*. (quoting *Moeller v. Harshbarger*, 794 P.2d 1148,

---

[16]  FTE's post-trial brief, Adv. Doc. No. 41, speaks of a "substantial liability," *id*. at 1, and it discusses the revenue FTE received in 2014–2016 from Ericsson, *id*. at 14.  But it makes no express assertion of the amount of damages it believes should be awarded, instead asserting that "FTE seeks to have such liability determined in these proceedings." *Id*. at 25.  This latter statement is repeated in FTE's reply brief, Adv. Doc. No. 43 at 21, but that reply also lacks any assertion of a precise damage amount.

MEMORANDUM OF DECISION - 18

1149 (Idaho 1990)). "Reasonable certainty" does not require mathematical exactitude, but only that the amount of damages be taken out of the realm of speculation. *Id*.

FTE alleges the Lien Letters caused Ericsson to stop issuing work orders to FTE. Ivie argues Ericsson reacted to FTE's failure to pay IDCS for services it performed. Each effectively argues that the other is responsible for Ericsson's decision. The Court was not provided any direct evidence from Ericsson regarding the basis for its decision not to issue FTE further work orders. Neither FTE nor Ivie provided any testimony from a representative of Ericsson as to whether Ivie's issuance of the Lien Letters was a major or minor factor in its decision. While it is undisputed that Ericsson's relationship with FTE changed shortly after the issuance of the Lien Letters, it is also undisputed that the changes also occurred shortly after Ericsson learned that FTE had not been paying IDCS as a subcontractor, despite having been paid by Ericsson. Given the lack of specific evidence regarding Ericsson's decision and reasoning, the Court finds and concludes—from the rest of the record—that the conduct of *both* parties contributed to the reduction in FTE's work from Ericsson.

FTE has not addressed the idea that Ericsson was faced with both Ivie's conduct and FTE's own delay in paying IDCS. FTE's reply brief, Adv. Doc. No. 43, merely argued "[t]here is only one credible causal explanation for the dramatic decline in revenue, as the timing of the issuance of the lien notice letters matches

MEMORANDUM OF DECISION - 19

perfectly with the decline, as opposed to a mere coincidence." However, as noted, the timing also matches up with the substantial unpaid receivable undergirding Ivie's ill-considered decision to issue such letters.

As noted above, the burden is on a plaintiff to establish, with reasonable certainty, not just a right to damages but the amount of damages. This includes addressing questions of allocation of damages. In *Harris, Inc. v. Foxhollow Const. & Trucking, Inc.*, 264 P.3d 400 (Idaho 2011), the Idaho Supreme Court affirmed a judgment entered against the plaintiff where the plaintiff failed to prove the amount of damages caused by the defendant.[17] The Court explained that:

> Because there was an overlap between the Johnson subcontract and the Foxhollow contract and no clear explanation in documentary evidence or trial testimony as to which entity failed to complete what work, it would not be possible to determine the allocation of damages between the two entities even if Harris' documents did contain accurate damage information. Accordingly, Harris' breach of contract claim against Johnson fails for lack of proper proof of damages.

*Id*. at 409.

While this Court is not attempting to allocate damages between two defendants, it must determine if any portion of FTE's damages can be attributed to Ivie with reasonable certainty. *Bohm v. The Horsley Co. (In re Groggel)*, 333 B.R. 261 (Bankr. W.D. Penn. 2005), illustrates this problem. There, a chapter 7 trustee alleged that the defendant, Horsley, was 100% liable for damages resulting from a

---

[17]  Foxhollow and L.N. Johnson Paving, LLC were collectively awarded a subcontract to perform excavation and paving work for Harris, Inc. Foxhollow and Johnson allegedly breached the subcontract and Harris filed an action to recover damages.

MEMORANDUM OF DECISION - 20

breached contract.  However, the court found Horsley was at fault for only part of the damage to the debtor, Groggel, and the trustee failed to prove Horsley was 100% liable.  Concluding that both Horsley and the debtor contributed to the damage the debtor suffered, the court explained:

> Because the Trustee fails to preponderantly prove that Horsley caused 100% of the damages that are sought by the Trustee in her contract breach cause of action, and since, as the Court finds, the Trustee offered little, indeed nothing, to the Court at trial that could now perhaps be used by the Court in an attempt to apportion between the Debtor and Horsley fault for some particular item or items of damage, what is the Court to do? The resolution of such dilemma is made even more difficult by the Court's earlier holding, as set forth above, that Horsley was actually at fault for some portion . . . of the [damages] that were actually incurred by the Debtor.  Can the Court simply make a wild guess as to the fault percentage that should be attributed to Horsley for each item of damage that was, or for the total amount of damages that were, incurred by the Debtor?  Of course not[.]

*Id*. at 296.[18]  Based on the lack of evidence regarding the relative fault of each

---

[18] California law, which was applicable in *Groggel*, is similar to Idaho law in that it requires damage to be proven with "reasonable certainty," although it provides a much lower standard of proof than Idaho law for proving the amount of damages.  California law, as outlined in *Groggel*, provides:

> "The burden of proof is on the party claiming damages to prove that he or she has suffered damage and to prove the elements of those damages with reasonable certainty." 23 Cal. Jur.3d Damages § 186 (West 2005). "Uncertainty as to the fact of damage, that is, as to the nature, existence, or cause of damage, is fatal to a recovery."  23 Cal. Jur.3d Damages § 31 (West 2005) (citing, inter alia, Cal.Civ.Code § 3301); *see also Id.* at § 32 (same); *Stephan v. Maloof*, 274 Cal.App.2d 843, 850, 79 Cal.Rptr. 461 (Cal.Ct.App.1969) (same). Thus, "[i]n an action for breach of contract, the plaintiff must prove that the breach was the cause of the damage [, and] ... the extent of the damage he or she sustained as a result of the breach." 23 Cal. Jur.3d Damages § 186. "[W]here there is no uncertainty as to fact of damage, that is, as to its nature, existence or cause, the same certainty as to its amount is not required." Stephan, 274 Cal.App.2d at 850, 79 Cal.Rptr. 461; *see also Acree v. General Motors Acceptance Corp.*, 92 Cal.App.4th 385, 398, 112

(continued...)

MEMORANDUM OF DECISION - 21

party, the *Groggel* court could not apportion liability.  Instead, it proceeded to

"search the trial record" to ascertain an amount for which Horsley could be held

liable.  *Id*.  The Court ultimately made an award based on a prelitigation settlement

offer made by Horsley that was introduced at trial, though that amount was less

than 10% of what was sought by the trustee.  *Id*. at 267.

      This Court faces a dilemma similar to *Harris* and *Groggel*.  It has

determined that Ivie is liable for at least a portion of FTE's damages.  However,

FTE is also, on this record, partly responsible for the situation leading to Ericsson

declining to assign future task orders to FTE.  No competent evidence exists upon

which the Court can identify Ivie's monetary liability.  Were the Court to assign a

portion of any claimed damages[19] to Ivie, it would effectively be speculative,

which is expressly prohibited under Idaho law.  As in *Groggel*, the Court has

carefully and painstakingly reviewed the record.  However, unlike *Groggel*, the

---

[18] (...continued)
Cal.Rptr.2d 99 (Cal.Ct.App.2001) (same); 23 Cal. Jur.3d Damages §§ 31, 32 & 186
(same).  "The law requires only that some reasonable basis of computation be used,
and the result reached can be a reasonable approximation."  *Acree*, 92 Cal.App.4th
at 398, 112 Cal.Rptr.2d 99; see also 23 Cal. Jur.3d Damages § 32 (once fact of
damage is certain, the amount of actual damage is to be determined by "liberal rule,"
that is "with as great a degree of certainty as the circumstances permit, and it is often
necessary to refer the problem of determining its extent to the discretion of the court
or the jury").

*Id*. at 283.  As discussed earlier, Idaho's standard is more exacting.

[19]  Recall, the only damage figure actually asserted by FTE was its complaint's allegation
of damages of "not less than $750,000."  Klumpp's testimony regarding revenue and expected
profits and gains had, in the Court's view, several problems and also did not clearly identify any
specific amount of damages, much less what was attributable to Ivie.  Thus, the "total amount" of
damages is also unclear.

MEMORANDUM OF DECISION - 22

Court is unable to locate any document or other piece of evidence upon which it can base an award of damages. FTE was required to provide evidence sufficient to take the amount of damages out of the realm of speculation; it failed to do so. Accordingly, FTE has not met its burden of establishing the amount of Ivie's liability for damages. Therefore, the Court finds and concludes that FTE has not established a debt owed by Ivie, which is a necessary requirement for establishing a claim under § 523(a)(6).

**CONCLUSION**

FTE failed to show Ivie tortiously interfered with the contract between FTE and Ericsson, but it did prove that Ivie intentionally interfered with FTE's prospective economic advantage by harming FTE's relationship with Ericsson. Ivie's culpable conduct may have supported a claim under § 523(a)(6), but FTE failed to carry its burden of providing preponderating evidence of the amount of Ivie's liability. Thus, FTE has not met its burden of proving the existence of a debt owed by Ivie. This is prerequisite to establishing its claim under § 523(a)(6), and the Court need not address the additional issues under that section. Therefore, the Complaint will be dismissed.

DATED: July 2, 2018

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 23